FEINMAN, J.
*1229 ***381 This matter comes to us from an order of the United States Court of Appeals for the Second Circuit certifying the following questions pursuant to rule 500.27 of this Court (Rules of Ct. of Appeals [ 22 NYCRR] § 500.27 ):
"(1) Before New York State's capacity-to-sue doctrine may be applied to determine whether a State-created public benefit corporation has the capacity to challenge a State statute, must it first be determined whether the public benefit corporation 'should be treated like the State,' [ ( Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co., 70 N.Y.2d 382, 387, 521 N.Y.S.2d 653, 516 N.E.2d 190 [1987] ) ], based on a 'particularized inquiry into the nature of the instrumentality and the statute claimed to be applicable to it,' [ ( John Grace & Co. v. State Univ. Constr. Fund, 44 N.Y.2d 84, 88, 404 N.Y.S.2d 316, 375 N.E.2d 377 [1978] ) ], and if so, what considerations are relevant to that inquiry?; and
"(2) Does the 'serious injustice' standard articulated in [ Gallewski v. Hentz & Co., 301 N.Y. 164, 174, 93 N.E.2d 620 (1950) ], or the less stringent 'reasonableness' standard articulated in [ Robinson v. Robins Dry Dock & Repair Co., 238 N.Y. 271, 144 N.E. 579 (1924) ], govern the merits of a due process challenge under the New York State Constitution to a claim-revival statute?" ( In re World Trade Ctr. Lower Manhattan Disaster *1230 Site Litig., 846 F.3d 58, 70 [2d Cir.2017].)
We accepted the certified questions on February 9, 2017 (see 28 N.Y.3d 1159, 49 N.Y.S.3d 89, 71 N.E.3d 581 [2017] ).
***382 I.
Plaintiffs in the consolidated appeal before the Second Circuit are workers who participated in cleanup operations in New York City following the September 11, 2001 terrorist attacks. The defendant is Battery Park City Authority (BPCA). BPCA was established by the State Legislature as a public benefit corporation to redevelop blighted areas in lower Manhattan and to expand the supply of safe and sanitary housing for low-income families (see Public Authorities Law §§ 1971, 1973[1] ). Plaintiffs initially brought claims between 2006 and 2009 alleging that they developed a host of illnesses as a result of their exposure to harmful toxins at BPCA-owned properties in the course of their cleanup duties.[1] However, in July 2009, the District Court dismissed plaintiffs' claims, together with hundreds of other similar claims against BPCA, on the grounds that the plaintiffs did not serve BPCA with timely notices of claim (see General Municipal Law § 50-e ; Public Authorities Law § 1984 ).
The legislature responded to these dismissals by enacting Jimmy Nolan's Law, which became effective September 16, 2009 (see L. 2009, ch. 440). The law amended the General Municipal Law to provide, in relevant part:
"Notwithstanding any other provision of law to the contrary, including ... section fifty-e of this article ... any cause of action against a public corporation for personal injuries suffered by a participant **550 in World Trade Center rescue, recovery or cleanup operations as a result of such participation which is barred as of the effective date of this subdivision because the applicable period of limitation has expired is hereby revived, and a claim thereon may be filed and served and prosecuted provided such claim is filed and served within one year of the effective date of this subdivision" ( General Municipal Law § 50-i[4][a], as added by L. 2009, ch. 440, § 2).
The effect of the law was to revive the plaintiffs' time-barred causes of action for one year after its enactment.
***383 Many of the 9/11 cleanup workers whose claims had previously been dismissed, including plaintiffs, served new notices of claim on BPCA within the one-year revival period prescribed by Jimmy Nolan's Law. BPCA moved for summary judgment on the grounds that Jimmy Nolan's Law was unconstitutional under the Due Process Clause of the State Constitution (see N.Y. Const., art. I, § 6 ). Upon due notice, the Attorney General intervened to defend the constitutionality of the law.
The District Court granted summary judgment in favor of BPCA and held that Jimmy Nolan's Law was unconstitutional as applied (see In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 66 F.Supp.3d 466 [S.D.N.Y.2014] ). As a threshold matter, the court recognized our "traditional rule that 'municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation' " ( id. at 471, quoting *1231 City of New York v. State of New York, 86 N.Y.2d 286, 289, 631 N.Y.S.2d 553, 655 N.E.2d 649 [1995] ). Nevertheless, the court cited a line of cases stating that "a 'particularized inquiry is necessary to determine whether-for the specific purpose at issue-the public benefit corporation should be treated like the State' " (id., quoting Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co., 70 N.Y.2d 382, 387, 521 N.Y.S.2d 653, 516 N.E.2d 190 [1987] ) and concluded that "BPCA is an entity independent of the State and has capacity to challenge the constitutionality of the Legislature's acts" ( id. at 473 ). On the merits, the court found the law unconstitutional on the grounds that it was not passed in response to "exceptional" circumstances or a "serious injustice" ( id. at 476, citing Gallewski v. Hentz & Co., 301 N.Y. 164, 93 N.E.2d 620 [1950] ).
Plaintiffs appealed to the Second Circuit. After discerning an "absence of authoritative guidance" on both the capacity issue and the proper standard of review in evaluating the constitutionality of claim-revival statutes ( 846 F.3d at 69 ), the Second Circuit certified the questions set out above.
II.
The first question essentially asks us to decide whether our general rule-that state entities lack capacity to challenge the constitutionality of a state statute-is any less applicable to public benefit corporations than it is to other types of governmental entities, such as municipalities. We hold that it is not, and that no "particularized inquiry" is necessary to determine whether public benefit corporations should be treated like the State for purposes of capacity.
***384 A.
Capacity "concerns a litigant's power to appear and bring its grievance before the court" ( Community Bd. 7 of Borough of Manhattan v. Schaffer, 84 N.Y.2d 148, 155, 615 N.Y.S.2d 644, 639 N.E.2d 1 [1994] ). Entities created by legislative enactment, such as the BPCA, **551 "have neither an inherent nor a common-law right to sue" ( id. at 155-156, 615 N.Y.S.2d 644, 639 N.E.2d 1 ). "Rather, their right to sue, if it exists at all, must be derived from the relevant enabling legislation or some other concrete statutory predicate" ( id. at 156, 615 N.Y.S.2d 644, 639 N.E.2d 1 ). Capacity should not be confused with standing, which relates to whether a party has suffered an "injury in fact" conferring a "concrete interest in prosecuting the action" ( Society of Plastics Indus. v. County of Suffolk, 77 N.Y.2d 761, 772-773, 570 N.Y.S.2d 778, 573 N.E.2d 1034 [1991] ), and which "go[es] to the jurisdiction of the court" ( City of New York, 86 N.Y.2d at 292, 631 N.Y.S.2d 553, 655 N.E.2d 649 ). Capacity, unlike standing, does not concern the injury a party suffered, but whether the legislature invested that party with authority to seek relief in court. As such, capacity is a question of legislative intent and substantive state law.
Generally, "municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation" ( id. at 289, 631 N.Y.S.2d 553, 655 N.E.2d 649 ). During the more than 80 years predating our City of New York decision, our courts characterized this prohibition somewhat inconsistently, referring to it, at various times (and sometimes simultaneously), as a lack of capacity (see County of Albany v. Hooker, 204 N.Y. 1, 97 N.E. 403 [1912] ), a lack of standing (see Village of Herkimer v. Axelrod, 58 N.Y.2d 1069, 462 N.Y.S.2d 633, 449 N.E.2d 413 [1983] ; Black Riv. Regulating Dist. v. Adirondack League Club, 307 N.Y. 475, 489, 121 N.E.2d 428 [1954] ;
*1232 Matter of Town of Moreau v. County of Saratoga, 142 A.D.2d 864, 531 N.Y.S.2d 61 [3d Dept.1988] ; City of Buffalo v. State Bd. of Equalization & Assessment, 26 A.D.2d 213, 272 N.Y.S.2d 168 [3d Dept.1966] ) or a substantive determination that the state acts complained of were not unconstitutional at all (see Matter of County of Cayuga v. McHugh, 4 N.Y.2d 609, 616, 176 N.Y.S.2d 643, 152 N.E.2d 73 [1958] ; Black Riv., 307 N.Y. at 489-490, 121 N.E.2d 428 ; Matter of Bowen v. State Commn. of Correction, 104 A.D.2d 238, 484 N.Y.S.2d 210 [3d Dept.1984] ; City of Utica v. County of Oneida, 187 Misc. 960, 965-966, 65 N.Y.S.2d 467 [Sup.Ct., Oneida County 1946], appeal dismissed 70 N.Y.S.2d 582 [4th Dept.1947] ). However, in City of New York, 86 N.Y.2d 286, 631 N.Y.S.2d 553, 655 N.E.2d 649, we definitively stated the rule in terms of capacity, as opposed to standing or substantive constitutional law. It has remained a capacity rule ever since (see Matter of County of Chemung v. Shah, 28 N.Y.3d 244, 262, 44 N.Y.S.3d 326, 66 N.E.3d 1044 [2016] ; Matter of County of Nassau v. State of New York, 100 A.D.3d 1052, 953 N.Y.S.2d 339 [3d Dept.2012], ***385 lv. dismissed and denied 20 N.Y.3d 1092, 965 N.Y.S.2d 77, 987 N.E.2d 638 [2013] ; Matter of New York Blue Line Council, Inc. v. Adirondack Park Agency, 86 A.D.3d 756, 758-759, 927 N.Y.S.2d 432 [3d Dept.2011], lv. denied sub nom. Matter of Clinton County v. Adirondack Park Agency, 18 N.Y.3d 806, 940 N.Y.S.2d 215, 963 N.E.2d 792 [2012] ; Gulotta v. State of New York, 228 A.D.2d 555, 645 N.Y.S.2d 41 [2d Dept.1996], appeal dismissed 88 N.Y.2d 1053, 651 N.Y.S.2d 402, 674 N.E.2d 332 [1996], lv. denied 89 N.Y.2d 811, 657 N.Y.S.2d 403, 679 N.E.2d 642 [1997] ).[2]
In City of New York, we rejected claims by the City of New York, Board of Education **552 of the City, Mayor and Chancellor of the City School District that the State's statutory scheme for funding public education denied school children their constitutional rights under the Education Article of the State Constitution, the Equal Protection Clauses of the Federal and State Constitutions and title VI of the Civil Rights Act of 1964 (see City of New York, 86 N.Y.2d at 289, 631 N.Y.S.2d 553, 655 N.E.2d 649 ). We observed that "municipal corporate bodies ... are merely subdivisions of the State, created by the State for the convenient carrying out of the State's governmental powers and responsibilities as agents" and held that the municipal plaintiffs therefore lacked capacity to bring their claims ( id. at 289-290, 631 N.Y.S.2d 553, 655 N.E.2d 649 ).
Our capacity rule reflects a self-evident proposition about legislative intent: the "manifest improbability" ( id. at 293, 631 N.Y.S.2d 553, 655 N.E.2d 649 ) that the legislature would breathe constitutional rights into a public entity and then equip it with authority to police state legislation on the basis of those rights. It also reflects sound principles of judicial restraint, "the extreme reluctance of courts to intrude in the political relationships between the Legislature, the State and its governmental subdivisions" ( id. at 296, 631 N.Y.S.2d 553, 655 N.E.2d 649 ). "[T]he Legislature, within constitutional limitations, may by legislative fiat diminish, modify or recall any power delegated" to its political subdivisions (Matter of County of Cayuga v. McHugh, 4 N.Y.2d 609, 614-615, 176 N.Y.S.2d 643, 152 N.E.2d 73 [1958] ). "[T]he entire subject being one of governmental and public policy, ... the wrong, if any, created and existing by the acts of the legislature, must be corrected by the legislature, or by an action where the people, as distinguished from a municipal corporate body, are before the court" ( City of New *1233 York, 86 N.Y.2d at 294, 631 N.Y.S.2d 553, 655 N.E.2d 649, quoting Hooker, 204 N.Y. at 18-19, 97 N.E. 403 ). Hence, with few exceptions, this capacity bar closes the courthouse doors to internal political disputes between the State and its subdivisions. ***386 The capacity rule is not absolute. A political subdivision with "express statutory authorization" to bring a constitutional challenge would not be found wanting in capacity ( id. at 291, 631 N.Y.S.2d 553, 655 N.E.2d 649 ; accord Hooker, 204 N.Y. at 9, 97 N.E. 403 ), though a generic grant of authority to "sue or be sued" will be insufficient ( City of New York, 86 N.Y.2d at 293, 631 N.Y.S.2d 553, 655 N.E.2d 649 ).[3] Even in the absence of explicit authority, the assertion of some constitutional rights may, by their nature, present special circumstances to which the general rule must yield (see id. at 291-292, 631 N.Y.S.2d 553, 655 N.E.2d 649 ). To date, we have identified a limited number of situations presenting such special circumstances, such as where a public entity is "vested with an entitlement to a specific fund by a statute" and the challenged statute adversely affects its interest in the fund ( Matter of Town of Moreau, 142 A.D.2d at 865, 531 N.Y.S.2d 61 ; accord **553 City of New York, 86 N.Y.2d at 291-292, 631 N.Y.S.2d 553, 655 N.E.2d 649 ; County of Rensselaer v. Regan, 173 A.D.2d 37, 578 N.Y.S.2d 274 [3d Dept.1991], affd. 80 N.Y.2d 988, 592 N.Y.S.2d 646, 607 N.E.2d 793 [1992] ), where a state statute impinges on a municipality's home rule powers under the State Constitution (see Town of Black Brook v. State of New York, 41 N.Y.2d 486, 393 N.Y.S.2d 946, 362 N.E.2d 579 [1977] ), or where a public entity asserts that if it is obliged to comply with a statute it "will by that very compliance be forced to violate a constitutional proscription" ( City of New York, 86 N.Y.2d at 292, 631 N.Y.S.2d 553, 655 N.E.2d 649, quoting Matter of Jeter v. Ellenville Cent. School Dist., 41 N.Y.2d 283, 287, 392 N.Y.S.2d 403, 360 N.E.2d 1086 [1977] ).[4] ***387 *1234 We stress that the exceptions we have recognized to date are narrow. Under the general rule, we have barred public entities from challenging a wide variety of state actions, such as, e.g., the allocation of state funds amongst various localities (see City of New York, 86 N.Y.2d 286, 631 N.Y.S.2d 553, 655 N.E.2d 649 ; Hooker, 204 N.Y. 1, 97 N.E. 403 ), the modification of a village-operated hospital's operating certificate (see Village of Herkimer, 58 N.Y.2d 1069, 462 N.Y.S.2d 633, 449 N.E.2d 413 ), the closure of a local jail by the State (see Matter of County of Cayuga, 4 N.Y.2d at 616, 176 N.Y.S.2d 643, 152 N.E.2d 73 ), special exemptions from local real estate tax assessments (see City of Buffalo, 26 A.D.2d 213, 272 N.Y.S.2d 168 ), laws mandating that counties make certain expenditures (see Gulotta, 228 A.D.2d 555, 645 N.Y.S.2d 41 ), state land use regulations (see New York Blue Line Council, 86 A.D.3d at 758-759, 927 N.Y.S.2d 432 ) and state laws requiring electronic voting systems to be installed at polling places in lieu of lever-operated machines (see County of Nassau, 100 A.D.3d 1052, 953 N.Y.S.2d 339 ).
B.
BPCA contends that public benefit corporations like itself are not fully governmental in nature. Therefore, BPCA argues, a court must conduct a "particularized inquiry" ( John Grace & Co. v. State Univ. Constr. Fund, 44 N.Y.2d 84, 88, 404 N.Y.S.2d 316, 375 N.E.2d 377 [1978] ) to determine whether a particular public benefit corporation should be treated like the State before the capacity rule can be applied. For the reasons that follow, we disagree.
There are three types of public corporations: municipal corporations, district **554 corporations and public benefit corporations (see General Construction Law § 65[b] ). A public benefit corporation is "a corporation organized to construct or operate a public improvement wholly or partly within the state, the profits from which inure to the benefit of this or other states, or to the people thereof" (id. § 66[4] ). Devised in the early twentieth century as "a new vehicle for funding public works projects" that "insulate[d] the State from the burden of long-term debt" ( Schulz v. State of New York, 84 N.Y.2d 231, 244, 616 N.Y.S.2d 343, 639 N.E.2d 1140 [1994] ), public benefit corporations are able to issue debt for which the State itself is not liable (see N.Y. Const., art. X, § 5 ). In addition, "[a]lthough created by the State and subject to dissolution by the State, these public corporations are independent and autonomous, deliberately designed to be able to function with a freedom and flexibility not permitted to an ordinary ***388 State board, department or commission" Matter of Plumbing, Heating, Piping & A.C. Contrs. Assn. v. New York State Thruway Auth., 5 N.Y.2d 420, 423, 185 N.Y.S.2d 534, 158 N.E.2d 238 (1959). We have therefore understood the primary utility of public benefit corporations as twofold: to "protect the State from liability" and to "enable public projects to be carried on free from restrictions otherwise applicable" ( id. at 423, 185 N.Y.S.2d 534, 158 N.E.2d 238 ). In this context, we have sometimes described public benefit corporations as "enjoying an existence separate and apart from the State, its agencies and political subdivisions" ( Schulz, 84 N.Y.2d at 246 n. 4, 616 N.Y.S.2d 343, 639 N.E.2d 1140 [collecting cases] ).
These properties, however, do not bring public benefit corporations outside of the scope of our capacity rule. It is true that much of our analysis in City of New York rested on the "historical fact" that municipalities are "mere[ ] subdivisions" having no "right to contest the actions of their principal or creator" ( *1235 City of New York, 86 N.Y.2d at 289-291, 631 N.Y.S.2d 553, 655 N.E.2d 649 ). However, our capacity rule is not a stilted axiom governing the position of the parts to the whole, or the relationship between the State as principal and its subdivisions as agents. Rather, as discussed above, it is nothing more than a commonsense presumption of legislative intent, informed by practical concerns about judicial overreach. The features that arguably render public benefit corporations something more than mere subdivisions, namely, the separation of "their administrative and fiscal functions from the State" ( Collins v. Manhattan & Bronx Surface Tr. Operating Auth., 62 N.Y.2d 361, 368, 477 N.Y.S.2d 91, 465 N.E.2d 811 [1984] ), do not diminish the considerations we have already mentioned that support this rule.
BPCA cites to a line of cases from this Court rejecting a per se rule that public benefit corporations are identified with the State. In those cases, we held that "[t]he mere fact that" a public benefit corporation
"is an instrumentality of the State, and as such, engages in operations which are fundamentally governmental in nature does not inflexibly mandate a conclusion that it is the State or one of its agencies ... Instead, a particularized inquiry into the nature of the instrumentality and the statute claimed to be applicable to it is required" ( John Grace & Co., 44 N.Y.2d at 88, 404 N.Y.S.2d 316, 375 N.E.2d 377 ).
***389 Under the particular circumstances presented in those cases, we held that a public benefit corporation would be treated like the State for purposes of immunity from punitive damages (see **555 Clark-Fitzpatrick, Inc., 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 ), but not for purposes of contract bidding requirements under the State Finance Law (see Matter of Plumbing, Heating, Piping & A.C. Contrs. Assn., 5 N.Y.2d 420, 185 N.Y.S.2d 534, 158 N.E.2d 238 ), sovereign immunity (Matter of Dormitory Auth. of State of N.Y. [Span Elec. Corp.], 18 N.Y.2d 114, 271 N.Y.S.2d 983, 218 N.E.2d 693 [1966] ), statutes providing for equitable relief to certain public contractors (see John Grace & Co., 44 N.Y.2d 84, 404 N.Y.S.2d 316, 375 N.E.2d 377 ) or a provision of the Penal Law punishing the submission of false instruments to the State (see People v. Miller, 70 N.Y.2d 903, 524 N.Y.S.2d 386, 519 N.E.2d 297 [1987] ).
However, applying this line of cases here would strip them of their context. The issue in each of these cases was whether a statute or common-law rule defining the State's rights or responsibilities vis-à-vis private parties could be extended to a public benefit corporation. Given the primary function of a public benefit corporation "to resemble in many respects a private business corporation ... as a means of expanding government operations into areas generally carried on by private enterprise" ( Collins, 62 N.Y.2d at 368, 371, 477 N.Y.S.2d 91, 465 N.E.2d 811 [internal quotation marks omitted] ), we understood that a public benefit corporation's outward-facing relations with private parties-such as employees, customers and other business counterparts-would not necessarily be subject to the same laws that might apply when one does business with the government. Hence, in most of these cases, our overriding aim was to give maximum effect to the legislature's intent; we closely analyzed the public benefit corporation's enabling act, or the statute claimed to be applicable to it, in order to determine whether the corporation was intended to assume the guise of a private person in its legal relations with the general public (see Clark-Fitzpatrick, Inc., 70 N.Y.2d at 386-388, 521 N.Y.S.2d 653, 516 N.E.2d 190 ; John Grace & Co., 44 N.Y.2d at 89, 404 N.Y.S.2d 316, 375 N.E.2d 377 ; Matter of *1236 Dormitory Auth., 18 N.Y.2d at 117-118, 271 N.Y.S.2d 983, 218 N.E.2d 693 ; Matter of Plumbing, Heating, Piping & A.C. Contrs. Assn., 5 N.Y.2d at 423-424, 185 N.Y.S.2d 534, 158 N.E.2d 238 ). As for Miller, we were specifically concerned that the statute at issue, if made applicable to statements given to public benefit corporations, could impose criminal penalties without "fair warning" to the public ( 70 N.Y.2d at 907, 524 N.Y.S.2d 386, 519 N.E.2d 297, citing People v. Nelson, 69 N.Y.2d 302, 514 N.Y.S.2d 197, 506 N.E.2d 907 [1987] ). None of the foregoing considerations apply where, as here, a court is called ***390 upon to evaluate a public benefit corporation's inward-facing relations with other state bodies.[5]
C.
The parties dispute the significance of two particular cases for our decision today. Plaintiffs and the Attorney General contend that this case falls within our ruling in Black Riv.
**556 Regulating Dist. v. Adirondack League Club, 307 N.Y. 475, 121 N.E.2d 428 (1954), where we held that the plaintiff, a river regulating district, could not maintain an action seeking a declaration that an act of the legislature was unconstitutional. By contrast, BPCA argues that our holding in Patterson v. Carey, 41 N.Y.2d 714, 395 N.Y.S.2d 411, 363 N.E.2d 1146 (1977) implicitly recognized that public corporations, under some circumstances, had capacity to bring such actions.
We agree with the plaintiffs and the Attorney General that our holding in Black Riv. precludes BPCA's proposed particularized inquiry approach. In that case, the Black River Regulating District (the District), a public corporation, sought a declaration that the Stokes Act (L. 1950, ch. 803), which prohibited "any river regulating board" from constructing certain reservoirs, was unconstitutional ( Black Riv., 307 N.Y. at 483-485, 121 N.E.2d 428 ). We rejected the District's attempted challenge. We observed that the District's "only purpose," to construct reservoirs, was "a State purpose" and the District therefore had "no special character different from that of the State" ( id. at 489, 121 N.E.2d 428 ). We also noted that the powers of the District to carry out these state purposes "are within the State's absolute discretion" to alter, impair or destroy ( id. at 487, 121 N.E.2d 428 ). "[P]olitical power conferred by the Legislature," we explained, "confers no vested right against the government itself.... [T]he power conferred by the Legislature is akin to that of a public trust [and may] be exercised not for the benefit or at the will of the trustee but for the common good" ( id. at 488, 121 N.E.2d 428 ).
***391 The District also argued that it could sue in order to vindicate the rights of its bondholders, whose bonds, it claimed, would be impaired if the Stokes Act were not struck down (see Black Riv. Regulating Dist. v. Adirondack League Club, 282 App.Div. 161, 168-170, 121 N.Y.S.2d 893 [4th Dept.1953], revd. 307 N.Y. 475, 121 N.E.2d 428 [1954] ). We rejected this contention; the mere fact that the District could issue certificates of indebtedness, we *1237 held, "does not confer upon [the District] an independent status by which they have standing ... to test the validity of the Stokes Act" ( Black Riv., 307 N.Y. at 489, 121 N.E.2d 428 ).
The precise holding in Black Riv., as we phrased it at the time, was that the plaintiffs lacked "standing" (or "status") to seek a declaration that the Stokes Act was unconstitutional ( id. at 489-490, 121 N.E.2d 428 ).[6] However, it is clear that there was no real issue of "standing" in that case; the defendant was a private landowner subject to a condemnation proceeding by the District, a proceeding that would have been unlawful unless the District obtained the declaration it sought that the Stokes Act was unconstitutional (see Black Riv. Regulating Dist. v. Adirondack League Club, 201 Misc. 808, 811, 115 N.Y.S.2d 572 [Sup.Ct., Oneida County 1952], revd. 282 App.Div. 161, 121 N.Y.S.2d 893 [1953], revd. 307 N.Y. 475, 121 N.E.2d 428 [1954] ). Rather, in holding that the District did not have "status" to sue ( Black Riv., 307 N.Y. at 490, 121 N.E.2d 428 ), the Court was contemplating what we now recognize as capacity rather than standing (see City of New York, 86 N.Y.2d at 291, 631 N.Y.S.2d 553, 655 N.E.2d 649, citing Black Riv., 307 N.Y. 475, 121 N.E.2d 428 ).
We find unpersuasive BPCA's attempt to distinguish Black Riv. BPCA argues that the District was only established as a "public corporation," not a "public benefit corporation." The Special Term in Black **557 Riv. described the District's enabling statute as follows:
"Section 431 provides that bodies corporate may be created 'to construct, maintain and operate reservoirs within such districts, subject to the provisions of this act, for the purpose of regulating the flow of streams, when required by the public welfare, including public health and safety. Such river regulating districts are declared to be public corporations and shall have perpetual existence and the power to acquire and hold such real estate ***392 and other property as may be necessary, to sue and be sued, to incur contract liabilities, to exercise the right of eminent domain and of assessment and taxation and to do all acts and exercise all powers authorized by and subject to the provision of this article. Such powers shall be exercised by and in the name of the board of the district' " ( Black Riv., 201 Misc. at 813, 115 N.Y.S.2d 572 ).
Therefore, it is clear that the District, in substance, if not in form, was a public benefit corporation (see General Construction Law § 66[4] ; see also Northern Elec. Power Co., L.P. v. Hudson Riv.-Black Riv. Regulating Dist., 122 A.D.3d 1185, 1186, 997 N.Y.S.2d 793 [3d Dept.2014] [describing the Black River Regulating District as a "public benefit corporation"] ). We note that the District would not qualify as either a municipal corporation or a district corporation (see General Construction Law § 66[2], [3] ), the only other types of public corporations (see id. § 65[b] ).
BPCA argues that, even if Black Riv. involved a public benefit corporation, our analysis was consistent with BPCA's proposed "particularized inquiry" test. According to this argument, the Court conducted such a particularized inquiry when it specifically identified the District's purposes "to construct reservoirs" as "a State purpose" ( 307 N.Y. at 489, 121 N.E.2d 428 ). Although the District lacked power to sue in that particular case, BPCA argues that this does not necessarily foreclose challenges by other public benefit corporations with different purposes and under different circumstances. We do not read Black Riv. so narrowly. There was nothing special about reservoir construction *1238 that compelled us to rule as we did; rather, it was enough that the District's raison d'être was to carry out its activities "for the common good" ( id. at 488, 121 N.E.2d 428 ). BPCA's attempt to harmonize its approach with Black Riv. fails because our description of the District's purposes in that case would apply with equal force to any other public benefit corporation, for the "true beneficiary" of any New York public benefit corporation is the State of New York and its people (Matter of New York Post Corp. v. Moses, 10 N.Y.2d 199, 204, 219 N.Y.S.2d 7, 176 N.E.2d 709 [1961] ).
BPCA's reliance on Patterson, 41 N.Y.2d 714, 395 N.Y.S.2d 411, 363 N.E.2d 1146 is misplaced. In that case, we considered an action by the members of the Board of the Jones Beach State Parkway Authority and the institutional trustee for the Authority's bondholders for a judgment declaring a state statute unconstitutional. However, as relevant here, we said only that "[w]e do agree with the Special ***393 Term ... that the governmental plaintiffs, as well as the institutional representative of the bondholders, have sufficient standing to maintain this action" ( id. at 719 n., 395 N.Y.S.2d 411, 363 N.E.2d 1146 ). The Special Term's ruling, in turn, suggests that the issue in Patterson (unlike in Black Riv. ) was standing as traditionally defined, rather than capacity (see Patterson v. Carey, 83 Misc.2d 372, 376, 370 N.Y.S.2d 783 [Sup.Ct., Albany County 1975] ["The individual plaintiffs as members of the Authority have the requisite **558 standing to obtain a declaratory judgment ... There can be no doubt that plaintiffs have a 'personal stake in the outcome' of this litigation" (citing Board of Educ. of Cent. School Dist. No. 1 v. Allen, 20 N.Y.2d 109, 281 N.Y.S.2d 799, 228 N.E.2d 791 [1967], affd. 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 [1968] ; Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 [1962] ) ], affd. 52 A.D.2d 171, 383 N.Y.S.2d 414 [3d Dept.1976], affd. as mod. 41 N.Y.2d 714, 395 N.Y.S.2d 411, 363 N.E.2d 1146 [1977] ).[7]
D.
We therefore hold that, under the capacity rule, public benefit corporations have no greater stature to challenge the constitutionality of state statutes than do municipal corporations or other local governmental entities. Of course, our holding today does not mean that public benefit corporations can never raise such constitutional challenges; like municipalities, they may avail themselves of an exception to the general rule (see City of New York, 86 N.Y.2d at 291-292, 631 N.Y.S.2d 553, 655 N.E.2d 649 ). However, courts need not engage in a "particularized inquiry" to determine whether a public benefit corporation should first be treated like the State. Unlike in other contexts, for purposes of our capacity bar, every public benefit corporation is the State.
III.
The second question, as originally certified, asks which of two purportedly inconsistent standards of review-the "reasonable[ness]" standard adopted in Robinson v. Robins Dry Dock & Repair Co., 238 N.Y. 271, 280, 144 N.E. 579 (1924) or the "serious injustice" standard adopted in Gallewski v. Hentz & Co., 301 N.Y. 164, 174, 93 N.E.2d 620 (1950) -governs the *1239 constitutionality of a claim-revival statute under the Due Process Clause of the New York Constitution. ***394 We do not read these cases to be in substantial disagreement; however, this case presents an opportunity for this Court to reconcile them and articulate a uniform standard of review. Therefore, in accordance with the certification of the Second Circuit (see In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 846 F.3d at 70 ["we do not bind the Court of Appeals to the particular questions stated"] ), we reformulate the second certified question as follows: "Under Robinson and Gallewski, what standard of review governs the merits of a New York State Due Process Clause challenge to a claim-revival statute?"
A.
At the outset, we note that the development of our law on claim-revival statutes has differed from the development of the federal rule.
Claim-revival statutes generally pose no issue under the Fourteenth Amendment to the United States Constitution (see Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 229, 115 S.Ct. 1447, 131 L.Ed.2d 328 [1995] [statutes of limitations "can be extended, without violating the Due Process Clause, after the cause of the action arose and even after the statute itself has expired"] ). The United States Supreme Court articulated the rule in Chase Securities Corp. v. Donaldson:
**559 "[W]here lapse of time has not invested a party with title to real or personal property, a state legislature, consistently with the Fourteenth Amendment, may repeal or extend a statute of limitations, even after right of action is barred thereby, restore to the plaintiff his remedy, and divest the defendant of the statutory bar" ( 325 U.S. 304, 311-312, 65 S.Ct. 1137, 89 L.Ed. 1628 [1945] ).
Unlike the federal rule, our state standard has not turned on this formal distinction between claim-revival statutes that intrude upon a "vested" property interest and those that do not. Rather, as we illustrate below, our cases have taken a more functionalist approach, weighing the defendant's interests in the availability of a statute of limitations defense with the need to correct an injustice. Each time we have spoken on this topic, we described circumstances that would be sufficient for a claim-revival statute to satisfy the State Due Process Clause, ***395 with specific reference to the facts then before us. Each of these cases merits our close attention.[8]
B.
The first case in which we directly addressed the constitutionality of a claim-revival statute was Robinson, 238 N.Y. 271, 144 N.E. 579, where a plaintiff brought a wrongful death action against defendants for the death of her husband. At the time, there was a two-year statute of limitations for such actions; the action was brought in December 1920, more than two years after the victim's death. During the two years following her husband's death, the plaintiff applied for, and received, a workers' compensation award, which by law was her exclusive remedy against the defendants. However, these benefits were cut off approximately two years after her husband's death when the United States Supreme Court struck down the applicable New York workers' compensation provision as unconstitutional (see Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 [1920] ). In *1240 response, the legislature amended the law in 1923 to allow such plaintiffs to commence an action, even if otherwise time-barred, within one year after the statute took effect.
The Court expressly declined to either adopt or reject the federal rule that the legislature had "general power to revive a cause of action for personal debts or a cause of action for tort," and decided that the case could be resolved on narrower grounds ( Robinson, 238 N.Y. at 276-277, 144 N.E. 579 ; cf. Campbell v. Holt, 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 [1885] ). While the Court acknowledged the possibility that, in some cases, a claim-revival statute would be unconstitutional, it declared that "both instinct and reason revolt at the proposition that redress for a wrong must be denied" where the enforcement of a statute of limitations would be "contrary to all prevailing ideas of justice" ( id. at 279, 144 N.E. 579 ). In support of this proposition, the Court quoted at length from two decisions by then-Chief Justice Holmes of the Supreme Judicial Court of Massachusetts, both of which were highly skeptical of striking down claim-revival statutes on constitutional grounds, but which did not outright embrace the proposition that such statutes were always constitutional (see id. at 277-279, 144 N.E. 579, citing ***396 Danforth v. Groton Water Co., 178 Mass. 472, 59 N.E. 1033 [1901] ; Dunbar v. Boston & P.R. Corp., 181 Mass. 383, 63 N.E. 916 [1902] ). In particular, **560 the Court cited with approval Justice Holmes' observation that
"the prevailing judgment of the profession has revolted at the attempt to place immunities which exist only by reason of some slight technical defect on absolutely the same footing as those which stand on fundamental grounds.... [M]ultitudes of cases have recognized the power of the Legislature to call a liability into being where there was none before, if the circumstances were such as to appeal with some strength to the prevailing views of justice and if the obstacle in the way of the creation seemed small" ( id. at 278, 144 N.E. 579, quoting Danforth, 178 Mass. at 476-477, 59 N.E. at 1033-1034 ).
Ultimately, the Court upheld the claim-revival statute at bar on the grounds that there was "no arbitrary deprivation by the Legislature" and that the statute "was reasonable" in response to a situation that "call[ed] for remedy" ( id. at 279-280, 144 N.E. 579 ).
The next case to revisit the Robinson doctrine was Gallewski, 301 N.Y. 164, 93 N.E.2d 620, an action by the administrator of the estate of Fritz B. Gutmann, a citizen and resident of the Netherlands. On May 10, 1940, the Netherlands was invaded by Nazi Germany. German authorities arrested Gutmann and deported him to a concentration camp; it was later learned that he was murdered there. Between May 14 and May 22, 1940, only days after the invasion, his New York brokerage firm executed a series of unauthorized securities transactions on his account. It was not until the liberation of the Netherlands in 1945 that a curator was appointed under Dutch law to administer Gutmann's assets. After the unauthorized transactions were discovered in 1946, the administrator of Gutmann's estate filed suit in 1948, but because the suit commenced more than six years after the cause of action accrued, it was barred by the statute of limitations. However, after the commencement of the action, the legislature amended the law to toll the statute of limitations for citizens of Axis-occupied countries during the period of such occupation (see L. 1949, ch. 326). The statute operated retroactively so as to revive claims, such as the plaintiff's, that had already been time-barred at the time of enactment (see Gallewski, 301 N.Y. at 170-171, 93 N.E.2d 620 ).
*1241 Addressing the constitutionality of the statute, the Court held that it would "treat the case within the limits of our decision ***397 in the Robinson case," which "must be read, at the very least, as holding that a revival statute is not necessarily and per se void as a taking of 'property' without due process of law" ( id. at 173, 174, 93 N.E.2d 620 ). The Court explained that Robinson "may be read, we think, as holding that the Legislature may constitutionally revive a personal cause of action where the circumstances are exceptional and are such as to satisfy the court that serious injustice would result to plaintiffs not guilty of any fault if the intention of the Legislature were not effectuated" ( id. at 174, 93 N.E.2d 620 ). Unlike the "inclusive and categorical rule" adopted by federal courts, Robinson "leave[s] the court free to approach each revival statute on its individual merits, in the light of its own peculiar circumstances and setting" (id. ). Applying the rule to the facts, the Court upheld the statute on the grounds that, "as in the Robinson case, the 'extension of the time to bring ... action was reasonable' " ( id. at 175, 93 N.E.2d 620, quoting Robinson, 238 N.Y. at 280, 144 N.E. 579 ). As with Robinson, the Gallewski Court expressly declined to either adopt or reject the federal standard (see id. at 173, 93 N.E.2d 620 ). **561 We next addressed the topic in 1954, when we affirmed, without opinion, a decision of the Appellate Division upholding amendments to the Workers' Compensation Law reviving claims for caisson disease (see Matter of McCann v. Walsh Constr. Co., 282 App.Div. 444, 123 N.Y.S.2d 509 [3d Dept.1953], affd. without op. 306 N.Y. 904, 119 N.E.2d 596 [1954] ). The claimant in that case was exposed to compressed air as he worked on the construction of the Queens Midtown Tunnel, his last exposure being in 1938. He did not develop caisson disease symptoms until 1950. The law in effect in 1938 provided that an employee who contracted an occupational disease and then left his employer was not entitled to compensation unless the disease was contracted "within the twelve months previous to the date of disablement" (L. 1931, ch. 344). In 1946, the legislature "recognized that it was unjust to apply this general rule to a disease like caisson disease which was of a slow-starting or insidious nature," and therefore amended the law to exclude "compressed air illness" from this time limitation (L. 1946, ch. 642) ( McCann, 282 App.Div. at 446-447, 123 N.Y.S.2d 509 ). In 1947, the legislature also amended the then-governing statute of limitations so that claims for slow-starting diseases could be commenced "within ninety days after disablement and after knowledge that the disease is or was due to the nature of the employment" (L. 1947, chs. 77, 624). These statutes retroactively revived the claimant's previously time-barred ***398 claims. The claimant sued within days of the onset of his first symptoms in 1950.
The Appellate Division recited Gallewski's holding that the legislature may revive a cause of action in response to a "serious injustice" ( McCann, 282 App.Div. at 449, 123 N.Y.S.2d 509, quoting Gallewski, 301 N.Y. at 174, 93 N.E.2d 620 ). The Gallewski standard, according to the Court, "follow[ed]" Robinson (id. ). Applying this standard, the Appellate Division easily found the law constitutional:
"This is a classic instance of the granting of legislative relief in a situation where the arbitrary application of the Statute of Limitations would work injustice. As the Legislature recognized, in the case of a disease of an insidious character, the effects of which might be latent or long delayed, the right to compensation might be barred by the operation of the Statute of Limitations even before the claimant was aware of the fact that he had the disease. In these *1242 circumstances, the Legislature did no more than to comply with the simple demands of justice in relieving innocent claimants of the effect of the statutory time limitations which would otherwise bar their right to compensation" ( id. at 450, 123 N.Y.S.2d 509 ).
The last of our cases addressing the constitutionality of claim-revival statutes was Hymowitz v. Eli Lilly & Co., 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989). Numerous plaintiffs brought suit against defendant drug manufacturers, alleging that they were injured by the drug diethylstilbestrol (DES) taken by their mothers while pregnant. As the Court recognized, "due to the latent nature of DES injuries, many claims were barred by the Statute of Limitations before the injury was discovered" ( id. at 503, 541 N.Y.S.2d 941, 539 N.E.2d 1069 ). The applicable statute of limitations period accrued on the plaintiffs' exposure to the drug; it was not until 1986 that the legislature addressed this problem and statutorily instituted a discovery rule for "the latent effects of exposure to any substance" (L. 1986, ch. 692, § 2). The same statute also revived for one year causes of action for exposure to DES that had previously been time-barred (id. § 4).
**562 The Hymowitz Court suggested a possible inconsistency between the Robinson and Gallewski tests (see Hymowitz, 73 N.Y.2d at 514, 541 N.Y.S.2d 941, 539 N.E.2d 1069 ). The Court held, however, that it "need not light upon a precise test here," since the statute at issue would pass muster even under the purportedly stricter Gallewski standard:
***399 "The latent nature of DES injuries is well known, and it is clear that in the past the exposure rule prevented the bringing of timely actions for recovery. Thus we believe that exceptional circumstances are presented, that an injustice has been rectified, and that the requirements of Gallewski v. Hentz & Co. (supra ) have been met" (id. ).
C.
The Second Circuit, in certifying this question, apparently read Robinson to hold that a statute will satisfy the State Constitution so long as it is "a 'reasonable' exercise of the Legislature's power" (In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 846 F.3d at 68, quoting Robinson, 238 N.Y. at 280, 144 N.E. 579 ). Our holding in Robinson was slightly more demanding than pure "reasonable[ness]": Robinson held that the Due Process Clause of the State Constitution is "satisfied if there was an apparent injustice which 'calls for [a] remedy,' and which is 'reasonable' and not 'arbitrary' " ( Hymowitz, 73 N.Y.2d at 514, 541 N.Y.S.2d 941, 539 N.E.2d 1069, quoting Robinson, 238 N.Y. at 279-280, 144 N.E. 579 ).
A close reading of Gallewski reveals that it did not overrule or narrow Robinson. To the contrary, it expressly reaffirmed the Robinson standard (see 301 N.Y. at 175, 93 N.E.2d 620 ["Here, as in the Robinson case, the 'extension of the time to bring ... action was reasonable' "] ). By elaborating that "[Robinson ] may be read ... as holding that the Legislature may constitutionally revive a personal cause of action where the circumstances are exceptional and ... serious injustice would result to plaintiffs not guilty of any fault" ( id. at 174, 93 N.E.2d 620 ), the Court was describing the particular circumstances of the case before it, providing additional color on Robinson and concluding that the extraordinary events of World War II more than satisfied the test. Any purported dichotomy between Robinson's and Gallewski's holdings is illusory.
The salient facts in each of Robinson, Gallewski, McCann and Hymowitz fall *1243 into the same pattern. First, there existed an identifiable injustice that moved the legislature to act. In Robinson, it was the plaintiffs' exclusive reliance on a provision of the workers' compensation law that was struck down by the United States Supreme Court (see 238 N.Y. at 279, 144 N.E. 579 ); in Gallewski, it was the occupation of the plaintiffs' countries of residence during World War II (see 301 N.Y. at 175, 93 N.E.2d 620 ); in Hymowitz and McCann, it was latent injuries caused by harmful exposure, which ***400 the plaintiffs were not able to attribute to an action or omission of the defendant until the statutory period to bring a claim had already expired (see Hymowitz, 73 N.Y.2d at 514-515, 541 N.Y.S.2d 941, 539 N.E.2d 1069 ; McCann, 282 App.Div. at 445-446, 123 N.Y.S.2d 509 ). Second, in each case, the legislature's revival of the plaintiff's claims for a limited period of time was reasonable in light of that injustice.
A more heightened standard would be too strict. In the context of a claim-revival statute, there is no principled way for a court to test whether a particular injustice is "serious" or whether a particular class of plaintiffs is blameless; such moral determinations are left to the elected **563 branches of government. While we have traditionally expressed an "aversion to retroactive legislation" (Matter of Hodes v. Axelrod, 70 N.Y.2d 364, 370-371, 520 N.Y.S.2d 933, 515 N.E.2d 612 [1987] ), of which claim-revival statutes are one species (see Matter of Decker v. Pouvailsmith Corp., 252 N.Y. 1, 5-6, 168 N.E. 442 [1929] ), "we have noted that the modern cases reflect a less rigid view of the Legislature's right to pass such legislation" ( Hodes, 70 N.Y.2d at 371, 520 N.Y.S.2d 933, 515 N.E.2d 612 ; see also Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 [1976] ["legislative Acts adjusting the burdens and benefit of economic life come to the Court with a presumption of constitutionality"] ). Nonetheless, there must first be a judicial determination that the revival statute was a reasonable measure to address an injustice.
D.
We now arrive at our answer to the second certified question, as reformulated herein. The cases we have just discussed all express one and the same rule: a claim-revival statute will satisfy the Due Process Clause of the State Constitution if it was enacted as a reasonable response in order to remedy an injustice.
IV.
Accordingly, the first certified question should be answered in the negative and the second certified question, as reformulated, should be answered in accordance with this opinion.

Though asserted in Federal District Court, New York law furnished the substantive law governing these claims (see Air Transportation Safety and System Stabilization Act, Pub. L. 107-42, § 408[b][2], 115 U.S. Stat. 241 [Sept. 22, 2001]; In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 846 F.3d at 62 n. 2 ).

In line with these precedents, all parties agree that the relevant bar to BPCA's challenge to Jimmy Nolan's Law, if it exists at all, is a capacity bar. None of the parties have asked us to reconfigure the rule as one of standing.

We disagree with the assertion in Judge Wilson's concurrence that capacity is a "binary," all-or-nothing proposition (Wilson, J., concurring op. at 406, 67 N.Y.3d at 567, 89 N.E.3d at 1247). To the contrary, we have recognized that "[c]apacity is examined with a view towards the relief sought" (Excess Line Assn. of N.Y. [ELANY] v. Waldorf & Assoc., 30 N.Y.3d 119, 123, 65 N.Y.S.3d 85, 87 N.E.3d 117 [2017] ), which means that the same party may have capacity to bring one kind of claim but not another (see Matter of Graziano v. County of Albany, 3 N.Y.3d 475, 479-481, 787 N.Y.S.2d 689, 821 N.E.2d 114 [2004] ; Silver v. Pataki, 96 N.Y.2d 532, 537-538, 730 N.Y.S.2d 482, 755 N.E.2d 842 [2001] ).

Our capacity rule is ultimately derived from a line of analogous federal cases sometimes referred to as the "Hunter cases" (see Hunter v. Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 [1907] ; see also Williams v. Mayor of Baltimore, 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 [1933] ; Trenton v. New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 [1923] ). Other state and federal courts, including the Supreme Court of the United States, have identified some possible additional exceptions to the Hunter cases (see e.g. Gomillion v. Lightfoot, 364 U.S. 339, 342-345, 81 S.Ct. 125, 5 L.Ed.2d 110 [1960] [equal protection challenges to race-based redistricting]; Branson Sch. Dist. RE-82 v. Romer, 161 F.3d 619, 628-629 [10th Cir.1998] [Supremacy Clause challenge], cert. denied 526 U.S. 1068, 119 S.Ct. 1461, 143 L.Ed.2d 546 [1999] ; Rogers v. Brockette, 588 F.2d 1057, 1067-1071 [5th Cir.1979] [Supremacy Clause challenge]; Star-Kist Foods, Inc. v. County of Los Angeles, 42 Cal.3d 1, 227 Cal.Rptr. 391, 719 P.2d 987 [1986 in bank] [Dormant Commerce Clause challenge], cert. denied 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 758 [1987] ; but see Indian Oasis-Baboquivari Unified Sch. Dist. No. 40 of Pima County, Ariz. v. Kirk, 91 F.3d 1240, 1242-1243 [9th Cir.1996] [rejecting Supremacy Clause challenge], appeal dismissed 109 F.3d 634 [9th Cir.1997 en banc] ). We have not yet considered whether analogous exceptions exist for purposes of New York's capacity rule. In any event, they are not relevant here.

BPCA argues that this case, too, involves a public benefit corporation's relationship with private third parties-the plaintiffs-and therefore falls within the "particularized inquiry" line of cases. This argument is unavailing. We are not distinguishing the "particularized inquiry" cases on the grounds that they only involved disputes between public benefit corporations and private parties-clearly, not all of them did (see e.g. Miller, 70 N.Y.2d 903, 524 N.Y.S.2d 386, 519 N.E.2d 297 ). Rather, the distinction is that, in those cases, the right, privilege or duty of the State claimed to be applicable to the public benefit corporation was one that regulated the State's legal relations with private parties, as opposed to a rule, such as our capacity rule, that only governs intrastate relations.

Separately, the Court held that the law was constitutional on the merits (see id. ).

The Special Term appeared to be relying on the United States Supreme Court's suggestion in Allen, on writ of certiorari from this Court, that local public officials who took an oath to support the United States Constitution had a "personal stake in the outcome" of the litigation (Allen, 392 U.S. at 241 n. 5, 88 S.Ct. 1923 ), thus satisfying the standing requirements articulated in Baker (see Baker, 369 U.S. at 204, 82 S.Ct. 691 ).

Although the parties disagree as to what the standard of review is, all parties agree that it should reflect our existing case law in some sense. Neither the plaintiffs nor the Attorney General have asked us to adopt the federal standard in this case.