Anaya v City of New York (2025 NY Slip Op 50800(U))

[*1]

Anaya v City of New York

2025 NY Slip Op 50800(U)

Decided on May 21, 2025

Supreme Court, New York County

Kingo, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 21, 2025
Supreme Court, New York County

Alberto Anaya, Plaintiff,

against
City of New York, NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, LIVEONNY FOUNDATION, KERVENS LOUISSANT, NEW YORK UNIVERSITY LANGONE HOSPITALS, Defendant.

Index No. 154130/2023

For Plaintiffs Alberto Anaya and Freddys Baldrich Hilder:
Edward H. Gersowitz and Anthony Makarov
Gersowitz Libo & Korek, P.C.
For Defendant New York City Health and Hospitals Corporation:
Andrew J. Orenstein
Harris Beach Murtha Cullina PLLC
For Defendant LiveOnNY Foundation:
Richard E. Lerner
Mazzola Lindstrom LLP
For Defendant NYU Langone Hospitals:
Robert J. Cecala
Aaronson Rappaport Feinstein & Deutsch LLP

Hasa A. Kingo, J.

The following e-filed documents, listed by NYSCEF document number (Motion 004) 78, 79, 80, 81, 94, 95, 96, 97, 102 were read on this motion to DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 005) 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 99, 100, 101 were read on this motion to DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 006) 92, 93, 98, 103 were read on this motion for DISMISSAL.

Upon the foregoing documents, defendants LiveOnNY Foundation ("LiveOnNY") (Motion Seq. 004), New York City Health and Hospitals Corporation ("HHC") (Motion Seq. 005), and NYU Langone Hospitals s/h/a "New York University Langone Hospitals" (Motion Seq. 006) (together, "Defendants") each move to dismiss the claims of plaintiff Alberto Anaya ("Alberto"). LiveOnNY and HHC also move to dismiss the request for punitive damages. For the reasons set forth herein, the motions are denied.
BACKGROUND
In this tort action, plaintiffs Alberto and Freddys Baldrich Hilder ("Freddys") (together, "Plaintiffs") seek damages in connection with the death and subsequent organ recovery of Myriam Hoyos de Baldrich (the "Myriam"). Myriam was Alberto's mother and Freddys' wife.[FN1]
As alleged in the amended complaint, on May 7, 2022 at 6:55 p.m., Myriam was struck and rendered unconscious by a Brooklyn bound "L" train in the subway tunnel beneath the intersection of Avenue of the Americas and West 14th Street in New York, New York (NYSCEF Doc No. 33, amended complaint ¶ 31). Myriam was then taken by ambulance to Bellevue Hospital where she was subsequently pronounced brain dead (id. ¶ 72). On May 12, 2022, the Chief Executive Officer of Bellevue executed an authorization for "Organs and Tissue Donation," and LiveOnNY, a nonprofit organization that facilitates organ and tissue donation, coordinated the removal and transplantation of Myriam's organs and tissues by NYU (id. ¶¶ 77-78, 85). After Myriam's organs and tissues were removed, her body was transported to the Office of the Chief Medical Examiner ("OCME"), where her fingerprints were taken and she was identified (id. ¶ 126-128). The Nassau County Police Department notified Alberto of Myriam's death on May 18, 2022 (id. ¶ 128). This information was then conveyed to Freddys (id. ¶ 131). Plaintiffs allege that there was a piece of paper bearing Myriam's name on her person when she was transported to Bellevue, but none of the Defendants made efforts to identify her and contact Plaintiffs prior to authorizing the organ donation and removing her organs (id. ¶¶ 105-112).
On May 5, 2023, Plaintiffs commenced this action by filing a summons and complaint that interposed causes of action against defendants the City of New York (the "City") and HHC for, among others, loss of sepulcher (NYSCEF Doc No. 1). On June 21, 2023, HHC filed a motion to dismiss for failure to state a cause of action and lack of capacity (NYSCEF Doc Nos. 5-11, Motion Seq. 001). On June 29, 2023, the City filed an answer to the complaint (NYSCEF Doc No. 12, answer). Plaintiffs opposed the motion and cross-moved for summary judgment on the issue of whether HHC interfered with Plaintiffs' right to possession of Myriam's remains, for leave to amend the complaint to add causes of action for negligent infliction of emotional [*2]distress and intentional inflection of emotional distress and to add defendants LiveOnNY, Kervens Louissant ("Louissant"), and NYU (NYSCEF Doc No. 14, 23, notice of cross-motion). By order and decision dated February 23, 2024, the motion to dismiss was denied with respect to the causes of action for loss of sepulcher and negligent infliction of emotional distress, the cross-motion for summary judgment was denied, and the cross-motion to amend was granted (NYSCEF Doc No. 31, decision and order). The supplemental summons and amended complaint were filed on February 26, 2024 and timely served thereafter. HHC, the City, and LiveOnNY each filed answers to the amended complaint (NYSCEF Doc No. 36, 42, 58, decisions and orders).
NYU then filed a motion to dismiss the amended complaint for failure to state a cause of action (NYSCEF Doc Nos. 44-48, Motion Seq. 002). Plaintiffs filed opposition and a cross-motion for summary judgment on NYU's liability as to Plaintiffs' negligence and loss of sepulcher claims (NYSCEF Doc No. 49, notice of cross-motion). Louissant also moved to dismiss the complaint as against him for failure to state a cause of action, which Plaintiffs opposed (NYSCEF Doc Nos. 56-57, Motion Seq. 003). This court denied NYU's motion and Plaintiffs' cross-motion and granted Louissant's motion by decision and order dated August 21, 2024 (NYSCEF Doc Nos. 65, 66, decision and order).
Pursuant to a preliminary conference order dated January 13, 2025, the court gave LiveOnNY, HHC, and NYU leave to file additional motions to dismiss Alberto's cause of action for loss of sepulcher "on [the] ground that such rights are vested in [Myriam's] husband" (NYSCEF Doc No. 84, preliminary conference order). Now, Defendants each move, by order to show cause, to dismiss Alberto's claims. LiveOnNY and HHC also move to dismiss the request for punitive damages. Plaintiffs oppose each motion.
Citing to Turner v. Owens Funeral Home, Inc. (140 AD3d 632, 634 [1st Dept 2016]), LiveOnNY argues that Alberto cannot recover damages in this action because Freddys has first priority to control the disposition of Myriam's remains under the Public Health Law. LiveOnNY also argues that the claim for punitive damages must be dismissed because the complaint does not allege facts that, if true, would show a fraudulent or evil motive, or otherwise outrageous circumstances. In opposition, Plaintiffs maintain that all "next of kin," as defined in the Estates, Powers & Trusts Law (the "EPTL"), may join in an action for loss of sepulcher. Plaintiffs further contend that, even if Alberto were not considered "next of kin," summary judgment should not be granted because questions of fact remain as to whether Freddys demonstrated a willingness to control the disposition of Myriam's remains. LiveOnNY reiterates its arguments in reply and objects to the application of the EPTL definition of "next of kin."
In its motion, HHC adopts the arguments promoted by LiveOnNY, asserting that only Freddys has a right to bring the cause of action for loss of sepulcher. HHC also argues that Plaintiffs cannot pursue punitive damages against HHC as a matter of law because the facts alleged "fall short of the type of intentional conduct that must be pleaded and proved to recover punitive damages" and because punitive damages against public benefit corporations like HHC are barred as a matter of public policy. In opposition, Plaintiffs reiterate their "next of kin" argument, and, with respect to punitive damages, argue that public benefit corporations like HHC are not automatically considered political subdivisions for all purposes under New York law. Rather, a particularized inquiry is required regarding the specific purpose presented and discovery is needed before the court may make such an inquiry. HHC reiterates it positions on reply and contests that the "particularized inquiry" promoted by Plaintiffs demonstrates that [*3]punitive damages may not be asserted against HHC.
Finally, NYU joins in LiveOnNY and HHC's argument that only Freddys may proceed as a plaintiff in this action. Plaintiffs reiterate their prior arguments in opposition.
DISCUSSION
New York courts have long recognized the right of a decedent's next of kin to control preservation and burial of the deceased (Foley v Phelps, 1 AD 551, 1896 [1st Dept 1896]; Darcy v Presbyterian Hosp. in City of New York, 202 NY 259 [1911]; Hasselbach v Mt. Sinai Hosp., 173 AD 89 [1st Dept 1916]).[FN2]
New York jurisprudence regarding the right of sepulcher has evolved over time, and the claim is now understood to be "less quasi-property and more the legal right of the surviving next of kin to find solace and comfort in the ritual of burial" (Shipley v City of New York, 25 NY3d 645, 653 [2015], quoting Melfi v Mount Sinai Hosp. (64 AD3d 26, 43 [1st Dept 2009]). In 2009, the Appellate Division, First Department, held that "for a right of sepulcher claim to accrue (1) there must be interference with the next of kin's immediate possession of decedent's body and (2) the interference has caused mental anguish, which is generally presumed" (Melfi, 64 AD3d at 39, supra). The court further held that the requisite interference could "arise either by unauthorized autopsy or by disposing of the remains inadvertently or [] by failure to notify the next of kin of the death" (id. [internal quotes omitted]).
As the law continued to develop, New York courts affirmed that a claim for loss of sepulcher may also arise where a defendant improperly deals with a body (Shipley, 25 NY3d at 653, supra), fails to provide timely notice of a death (Rugova v City of New York, 132 AD3d 220 [1st Dept 2015]; Williams v City of New York, 188 AD3d 442, 864 [1st Dept 2020]), or for unauthorized transport and possession of a body (Turner, Inc. (140 AD3d 632, supra). In 2021, The Appellate Division, First Department, clarified that recovery under the common-law right of sepulcher is not limited only to instances where the next of kin is denied immediate possession of the decedent's body (Almeyda v Concourse Rehab. & Nursing Ctr., Inc., 195 AD3d 437, 438 [1st Dept 2021]). Rather, damages may also be awarded where the defendant "improperly deals with" the decedent's body, even where the plaintiff was permitted to take custody of the decedent's body in a timely fashion (id. at 438-439 ["We disagree that Melfi may be read to limit the theories of relief available under a right of sepulcher claim as a matter of law"]).
The language used by the court in Melfi is reflected in the Pattern Jury Instruction for loss of sepulcher, which begins as follows:
The plaintiff, AB, is the [state AB's relationship to the decedent, EF, e.g. spouse], of EF, who died on [state date]. AB had a right to [state applicable right: possession of EF's remains or notification of EF's death] and has brought this action against the defendant, CD, claiming that CD interfered with that right.
In order to recover, AB, must prove that: (1) CD interfered with AB's right to [state applicable right: possession of EF's remains or notification of EF's death]; (2) the interference was unauthorized; and (3) the interference caused AB mental suffering, or emotional or psychological injury.
(PJI 3:6A).

Referencing the more recent developments from Almeyda, inter alia, Caveat 4 to the instruction cautions that "[t]he pattern charge provides only one illustrative fact pattern under which the claim for interference with the right of sepulcher may arise," and instructs that "[t]he charge must be modified, if necessary, to address the specific facts presented by the case before the court" (PJI 3:6A, Caveat 4). Caveat 4 goes on to acknowledge that "[t]he same set of facts may give rise to multiple causes of action, and care must be taken to charge the jury on each cause of action supported by the evidence" (id.). "The following claims, which are designed to compensate an individual for emotional injuries and mental anguish caused by the conduct of a defendant relating to the individual's relative, are cognizable: (1) a claim premised on a defendant's mishandling of the corpse of a relative of plaintiff; (2) a claim premised on a defendant's conveyance of misinformation regarding the death of a relative of plaintiff; and (3) the common law cause of action of interference with the right of sepulcher, i.e. the right of a decedent's next of kin to immediate possession of decedent's body for preservation and burial" (id.).
Throughout this jurisprudence, the term "next of kin" is used to describe the person or persons who may bring a claim for loss of sepulcher, but the term is not defined at common law (see Rakow v State, 18 Misc 3d 904, 911 [Ct Cl 2007] ["Case law, at least as uncovered by this [c]ourt, does not define 'next of kin'"], citing to Matter of Bernstein, 185 Misc 2d 493 [Sur Ct, Bronx County 2000]; Whack v St. Mary's Hosp. of Brooklyn, 2003 NY Slip Op 50026[U] [Civ Ct, Kings County 2003]). Plaintiffs contend that this court should adopt the definition of "next of kin" set forth in the EPTL. The EPTL provides that "[w]henever used in a statute or instrument, unless a contrary intention is expressed therein, the term 'heirs', 'heirs at law', 'next of kin' or any term of like import means the distributees, as defined in 1-2.5" (EPTL § 2-1.1). A "distributee" is "a person entitled to take or share in the property of a decedent under the statutes governing descent and distribution" (EPTL § 1-2.5). However, Plaintiffs do not cite any court that has used this definition within the context of a cause of action for loss of sepulcher, nor does Plaintiffs' position comport with the plain language of the EPTL, which limits its application to instances where the term is used in a statute or instrument (EPTL § 2-1.1 ["Whenever used in a statute or instrument"]). The use of the EPTL definition is also contradicted by cases where plaintiffs who are not "distributees" under the EPTL were nonetheless permitted to proceed with claims for loss of sepulcher (see Rugova, 132 AD3d at 231, supra [parents and siblings permitted to pursue damages for loss of sepulcher]; Williams, 188 AD3d at 846, supra [children and sibling permitted to pursue claim for loss of sepulcher]; EPTL § 4-1.1 [a] [4] [parents are sole distributee where decedent is survived by one or both parents, no spouse and no issue]; EPTL § 4-1.1 [a] [3] [children are sole distributees where decedent is survived by children and no spouse]). Considering these factors, this court is unpersuaded that it should adopt the EPTL definition of "next of kin" to define who may maintain a cause of action for loss of sepulcher.
Relying on Turner v. Owens Funeral Home, Inc. (140 AD3d 632), Defendants assert that [*4]only the individual with the highest priority to control disposition of a body under the Public Health Law has a right to recover damages for loss of sepulcher (NYSCEF Doc No. 79, Lerner aff ¶ 6; NYSCEF Doc No. 83, Orenstein aff ¶ 2; NYSCEF Doc No. 93, Tracey aff ¶ 5).
In relevant part, Public Health Law § 4201 provides the following:
2. (a) The following persons in descending priority shall have the right to control the disposition of the remains of such decedent; provided that if there are more than two members of a class listed in subparagraph (iii), (v), or (vii) of this paragraph entitled to control the disposition of remains of a decedent, the disposition shall be determined by a majority of the members of the class who are reasonably available: . . .
(ii) the decedent's surviving spouse; . . .
(iii) any of the decedent's surviving children eighteen years of age or older; . . .
(b) If a person designated to control the disposition of a decedent's remains, pursuant to this subdivision, is not reasonably available, unwilling or not competent to serve, and such person is not expected to become reasonably available, willing or competent, then those persons of equal priority and, if there be none, those persons of the next succeeding priority shall have the right to control the disposition of the decedent's remains.
(Public Health Law § 4201 [2][a][ii]-[iii], [2][b]).

In Turner, the plaintiff Shatima Turner ("Shatima") was selected by her family to handle the funeral arrangements for her deceased grandmother (Turner v Owens Funeral Home, Inc., 41 Misc 3d 444, 445 [Sup Ct, NY County 2013]). "On December 28, 2011, Shatima went to [] Owens Funeral Home, Inc. ('Owens Funeral Home') to discuss the possibility of having it handle the funeral arrangements and a written proposal was prepared" (id.). Shatima did not sign the proposal (id.). The following day, Shatima visited Unity Funeral Chapel Inc. ("Unity") and secured its services to handle the funeral (id. at 445-446). However, when Unity contacted defendant Long Island Jewish Medical Center (the "hospital") to arrange transfer of decedent's remains, Unity learned that the body had already been released to the Owens Funeral Home (id. at 446). Shatima and several of the decedent's surviving adult children then filed an action for loss of sepulcher against the hospital and the Owens Funeral Home, among others (id.). On a cross-motion for summary judgment, the hospital moved for summary judgment to dismiss Shatima's claims because she did not have priority under the Public Health Law to control the disposition of the body. The court granted this portion of the cross-motion, dismissing Shatima's claims. On appeal, the Appellate Division, First Department, affirmed the dismissal, holding that, as the decedent's granddaughter, Shatima had "standing," but not "priority" to control the disposition of the decedent's remains under Public Health Law § 4201 (2) where the decedent's surviving children indicated their willingness to control disposition of the decedent's remains (Turner, 140 AD3d at 634 ["That decedent's children elected Shatima to act as their agent to handle the funeral arrangements does not elevate her priority where, as here, they nonetheless indicated their willingness to control the disposition of Turner's remains"]).
Assuming, arguendo, that this court were to apply Turner in the manner Defendants suggest, this would not result in the dismissal of Alberto's claims. At the outset, Turner was decided on summary judgment, where there was no question of fact that the decedent's children were willing and able to control disposition of the remains (140 AD3d at 634). By contrast, this [*5]matter comes before the court on a pre-answer motion to dismiss where the court and parties lack the benefit of discovery. Nevertheless, Freddys' section 50-h testimony raises numerous questions of fact regarding whether he was "reasonably available, willing, or competent" to control the disposition of her remains at the time of Myriam's death.
At his 50-h hearing, Freddys testified that he had lived in Columbia without Myriam for three years prior to her death (NYSCEF Doc Nos. 94, Markarov aff in opposition ¶ 20; NYSCEF Doc No. 17, transcript at 11). He did not visit Myriam during this time, and did not return to the United States until after her death (id. at 13). He was hospitalized in Columbia from May 11, 2022 until May 29, 2022 (id. at 20). While hospitalized, he was treated for high blood pressure, an antibiotic-resistant bacterial infection, and underwent surgery on May 24, 2022 (id. at 19-20). Freddys was informed that Myriam was missing during his hospitalization and was informed of her death on May 19, 2022 (id. at 18, 20). Freddys testified that he was unable to go to the United States during this time or attend Myriam's funeral because he was undergoing treatment for the antibiotic-resistant bacteria, which he described as "a difficult bacteria to fight," from May 19, 2022 until May 24, 2022 (id. at 21). He further testified, "[m]y intention was to go to the United States, but I thought it was going to complicate the fact of the treatment for the bacteria and that if it wasn't treated, the bacteria could actually increase and get worse" (id.). Freddys also testified that he never spoke with the Nassau County Police Department during this or any time (id.). Freddys testimony that he was absent from the jurisdiction at the time of Myriam's death, undergoing medical treatment for serious illness, and was unable to plan or attend her funeral, raises questions of fact regarding whether he was "reasonably available, willing, or competent" to control the disposition of her remains at the time of her death. As such, Defendants have not met their burden with respect to this issue (see Shepherd v Whitestar Dev. Corp., 113 AD3d 1078, 1080-1081 [4th Dept 2014] ["the burden is on defendants in the context of their motions for summary judgment to establish that there is no possibility that plaintiff has a right to possession of decedent's remains, and they failed to meet it"]).[FN3]

Furthermore, the actionable conduct alleged in Turner included unauthorized transport and possession of a body, giving rise to the type of claim the Pattern Jury Instructions refers to as "the common law cause of action of interference with the right of sepulcher, i.e. the right of a decedent's next of kin to immediate possession of decedent's body for preservation and burial," as distinguished from two other cognizable claims "designed to compensate an individual for emotional injuries and mental anguish caused by the conduct of a defendant relating to the individual's relative" (PJI 3:6A, Caveat 4). To the extent that Turner may limit who has the right to pursue damages for a claim for emotional injuries and mental anguish caused by the conduct of a defendant relating to the individual's relative, there is no indication that this limitation extends to all three types of claims described in the Pattern Jury Instructions or in all circumstances.
A narrow reading of Turner is supported by an extensive body of law where courts held that multiple "next of kin" may join as plaintiffs in an action to recover for loss of sepulcher or otherwise permitted such claims to proceed (Brown v Broome Cnty., 8 NY2d 330, 333 [1960] [*6][Joinder of deceased's family members, including minor children, permissible in single action for loss of sepulcher]; Williams, 188 AD3d at 846, supra [next of kin including children and sibling of decedent have viable cause of action for loss of sepulcher where City failed to notify family of his death before disposing of remains]; Rugova, 132 AD3d at 231, supra [parents and sibling of decedent had standing to bring action and claim damages for loss of sepulcher]; Wainwright v New York City Health & Hosps. Corp., 61 AD3d 852, 853 [2d Dept 2009] ["Relatives of a deceased person may not maintain separate actions against those whom they allege mishandled their relative's body; however, next of kin may join together in such a lawsuit"]; see also Gostkowski v Roman Catholic Church, 262 NY 320 [1933]; Plunkett v NYU Downtown Hosp., 21 AD3d 1022 [2005]; Nesbit v Turner, 15 AD3d 552 [2005]; Weingast v State of New York, 44 Misc 2d 824, 826 [1964]). Although "priority" was not raised in the cases, the plaintiffs unquestionably include individuals of different "priority" under the Public Health Law.
Of particular note, in Rugova v. City of New York, the Appellate Division, First Department, considered whether the parents and siblings of the decedent could maintain a cause of action for loss of sepulcher against the City for failure to timely notify them of the death of their family member (132 AD3d at 222, supra). The court held in the affirmative, clarifying that "this [c]ourt's holding that interference with the next of kin's right to immediate possession of a decedent's body may arise from the municipality's failure to notify them of the death presumes a ministerial duty owed directly to the immediate family" (id. [emphasis added]; see also Johnson v State, 37 NY2d 378, 381 [1975] ["The second exception permits recovery for emotional harm to a close relative resulting from negligent mishandling of a corpse"]). The court also held that the plaintiffs had "standing to bring [the] action and claim such damages" for loss of sepulcher arising from the City's failure to timely notify them of the death of their son and brother (132 AD3d at 231, supra [emphasis added]).[FN4]
 Children of a decedent have higher "priority" to control disposition of the remains under the Public Health Law than siblings (Public Health Law § 4201 [2][a][ii]-[iii]).
Despite being decided by the same court just one year later, Turner makes no reference to Rugova and the court gives no indication that it intended to overrule its prior holding. Notably, both cases cite to Public Health Law § 4201 (2) and Shepherd v. Whitestar Dev. Corp. (113 AD3d 1078 [4th Dept 2014]) in reaching their respective conclusions. Taken in the context with the other factors cited here, this suggests that damages for some claims, for example those premised on a defendant's mishandling of the corpse of a relative of plaintiff or "conveyance of misinformation regarding the death of a relative of plaintiff" (PJI 3:6A, Caveat 4), may not be limited to the individual with the highest priority to control disposition of the remains. Plaintiffs' factual allegations implicate all three types of claims described in the PJI. Therefore, the motions to dismiss Alberto's claims are denied.
LiveOnNY and HHC also separately move to dismiss Plaintiffs' request for punitive damages. "To recover punitive damages, a plaintiff must show, by clear, unequivocal and convincing evidence, egregious and willful conduct that is morally culpable, or is actuated by evil and reprehensible motives" (Munoz v Puretz, 301 AD2d 382, 384 [1st Dept 2003]). Both [*7]LiveOnNY and HHC argue that the alleged conduct does not rise to the level necessary to support an award of punitive damages. However, Punitive damages are available for a cause of action for loss of sepulcher (Melfi, 64 AD3d at 43, supra), and it is well established that "[w]hether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the original trier of the facts" (Swersky v Dreyer and Traub, 219 AD2d 321, 328 [1st Dept 1996]). Given that no discovery has taken place in this matter and the relevant facts and circumstances are uncertain, dismissal of the punitive damages on this basis is not appropriate at this time.[FN5]

HHC also argues that it is not subject to punitive damages because it is a public benefit corporation. Generally, punitive damages are not recoverable against a state or its political subdivisions, including municipalities, unless specifically provided for by statute (see Krohn v New York City Police Dept., 2 NY3d 329, 335 [2004], citing Sharapata v. Town of Islip, 56 NY2d 332, 336 [1981]). This is a matter of public policy, recognizing that "the goals of punishment and deterrence are not served when punitive damages are imposed against the State, for in such circumstances, it ultimately is the innocent taxpayer who is punished" (Clark-Fitzpatrick, Inc. v Long Island R. Co., 70 NY2d 382, 386 [1987]). "Although punitive damages may be appropriately imposed against a private profit-making corporation, a municipality is different because it is not organized for any purpose of gain or profit, but it is a legal creation engaged in carrying on government and administering its details for the general good and as a matter of public necessity" (id. [internal quotes omitted]).
A public benefit corporation is "a corporation organized to construct or operate a public improvement wholly or partly within the state, the profits from which inure to the benefit of this or other states, or to the people thereof" (General Construction Law § 64 [4]). "[P]ublic benefit corporations [] created by the State for the general purpose of performing functions essentially governmental in nature, are not identical to the State or any of its agencies, but rather enjoy, for some purposes, an existence separate and apart from the State, its agencies and political subdivisions" (John Grace & Co. v State Univ. Const. Fund, 44 NY2d 84, 88 [1978]; see also In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 30 NY3d 377, 388-389 [2017]). "[A] particularized inquiry is necessary to determine whether—for the specific purpose at issue—the public benefit corporation should be treated like the State" (Clark-Fitzpatrick, 70 NY2d at 387; John Grace, 44 NY2d at 88 ["Instead, a particularized inquiry into the nature of the instrumentality and the statute claimed to be applicable to it is required."]).
The requisite particularized inquiry requires the court to determine whether the statutes creating the public benefit corporation and empowering it to operate "such a degree of identity as to be considered an integral part of the State qua State" (John Grace, 44 NY2d at 88). The court must also consider the powers, functions, and obligations of the public benefit corporation as part of its inquiry (id. at 89 ["upon consideration of its powers, functions and obligations, that the Fund, which enjoys a separate existence, independently transacts its business and hires and compensates its own personnel outside of the civil service system, is not identical with the State"]). This can include, inter alia, consideration of the purpose for which the public benefit corporation was created, whether it performs an essential public function, its sources of funding and ratio of public to private funding, the extent to which it operates independently of the state, whether the public benefit corporation is treated as the state for other purposes, and whether the public benefit corporation is the sole provider of the service it provides (In re World Trade Ctr. Litig., 30 NY3d at 389, supra [discussion of particularized inquiry]; Clark-Fitzpatrick, 70 NY2d at 387-388, supra [Long Island Rail Road Company considered State or political subdivision for the purpose of punitive damages]; John Grace, 44 NY2d at 88-90, supra [State University Construction Fund not considered State or political subdivision for purpose of statutes authorizing cost adjustments in public construction contracts]; Plumbing, Heating, Piping & Air Conditioning Contractors Ass'n, Inc., v New York State Thruway Auth., 5 NY2d 420, 424 [1959] [New York State Thruway Authority not treated as state for purposes of contract bidding requirements under the State Finance Law]).
The court may also consider whether the public benefit corporation has the right to conduct its business independently and its own corporate governance separate from the State (Dormitory Auth. of State of NY v Span Elec. Corp., 18 NY2d 114, [1966] [Dormitory Authority not so identical with state as to have sovereign immunity which shields it from effect of arbitration clause in building contract]). For example, in Dormitory Auth. of State of NY v Span Elec. Corp., the Court considered that the Authority has the power "to sue and be sued; to have its own seal; to make its own bylaws; to appoint officers, agents and employees as well as fix their compensation; to acquire real property in the name of the State; to acquire personal property for its own corporate purposes" (id. at 116). Finally, the court may consider the nature of the offense alleged (People v Miller, 70 NY2d 903, 906 [1987] [Metro—North may not be treated as if it were the state or any political subdivision thereof for the purpose of Penal Law § 175.35]).
In support of its motion, HHC points to two cases where the United States District Court for the Southern District of New York determined that HHC is properly considered a political subdivision for the purpose of the New York Labor Law (NYLL), and, therefore, not subject to punitive damages for claims asserted thereunder (Cromwell v New York City Health & Hosps. Corp., 983 FSupp 2d 269 [SDNY 2013]; Drayton v MetroPlus Health Plan, Inc., 791 FSupp2d 343 [SDNY 2011]). In Drayton, the court noted that HHC was created "to perform an essential public and governmental function . . . of providing and delivering comprehensive care and treatment of the ill and inform, which is in all respects for the benefit of the people of . . . New York" (791 FSupp2d at 346, citing McKinney's Unconsolidated Laws of NY § 7382 [internal quotation marks omitted]), and receives a substantial portion of its funding from the State and City of New York (id. at 348). The court also determined that HHC "is considered a governmental entity and political subdivision" in other labor and employment contexts, including the National Labor Relations Act, New York's Civil Service Law, and others (id. at [*8]347). Thus, the court determined that HHC is not subject to punitive damages for the purpose of New York Labor Law (id. at 347). Cromwell follows Drayton to reach the same conclusion (983 FSupp2d at 276).
Although the persuasive authority set forth in Drayton may inform this court's analysis, the question was considered within the context of the Labor Law. Neither party cites to, nor could this court locate, any court that has performed a similar analysis concerning HHC within the context of tort, either with respect to negligence or intentional torts. In the limited briefing on this issue, neither party addresses the question within the context of tort law or includes any discussion of HHC's powers, functions, and obligations to members of the public receiving medical care in its facilities. Nor has HHC submitted any evidentiary support for its motion with respect to this issue—for example, by providing evidence regarding what portion of its budget is funded by the State and City as opposed to other sources, or what percentage of its employees, if any, are not covered by the Civil Service Law.
Under Clark-Fitzpatrick, a particularized inquiry is required with respect to the specific purpose at issue (Clark-Fitzpatrick, 70 NY2d at 387, supra ["particularized inquiry is necessary to determine whether—for the specific purpose at issue—the public benefit corporation should be treated like the State"] [emphasis added]). Whereas neither HHC nor the Plaintiffs have properly addressed this question in their briefing and the court lacks any evidentiary evidence relevant to this issue, this portion of the motion is denied. However, HHC may renew its application to dismiss the request for punitive damages against it on a motion for summary judgment, upon the submission of proper legal and evidentiary support.
Accordingly, it is
ORDERED that the motion of defendant LiveOnNY Foundation (Motion Seq. 004) to dismiss is denied; and it is
ORDRED that the motion of New York City Health and Hospitals Corporation (Motion Seq. 005) to dismiss is denied, with leave to renew its motion to dismiss the request for punitive damages on a motion for summary judgment, upon the submission of proper legal and evidentiary support; and it is
ORDERED that the motion of NYU Langone Hospitals s/h/a "New York University Langone Hospitals" to dismiss is (Motion Seq. 006) denied; and it is further
ORDERED that a settlement conference for this matter will be held on July 1, 2025, at 11:30 a.m. at 80 Centre Street, Room 320, New York, New York.
This constitutes the decision and order of the court.
DATE 5/21/2025
HASA A. KINGO, J.S.C.

Footnotes

Footnote 1:The facts are recited here as set forth in the amended complaint (NYSCEF Doc No. 33) and are accepted as true for the purpose of this motion, except where otherwise noted. A fuller recitation of the facts is set forth in this court's prior decisions dated February 23, 2024 and August 21, 2024 (NYSCEF Doc Nos. 31, 65-66).

Footnote 2:A thorough and insightful recitation of the historical and spiritual underpinnings of the right of sepulcher may be found in the Appellate Division, First Department, decision in Melfi v Mount Sinai Hosp. (64 AD3d 26, 32 [1st Dept 2009] ["The right of sepulcher, evoking the mystery and sorrow of death and the hope for an afterlife, has been ritualized since the earliest pre-Christian civilizations"]).

Footnote 3:It is unclear whether Defendants allege that Freddys, Myriam's spouse, would lose the right to claim damages for loss of sepulcher if he is determined to have been unavailable, unwilling, or not competent to control the disposition of her remains at the time of her death.

Footnote 4:Defendants contend that the issue of "priority" was not addressed in Rugova because the issue was not preserved for appeal, but there is no indication in the decision that the issue was raised but not preserved for appeal or that this impacted the Court's decision.

Footnote 5:HHC's reliance on Ross v. Louise Wise Servs. (8 NY3d 478 [2007]) regarding this issue is particularly misplaced. Not only were the conduct and causes of action assertion in Ross entirely different from this case, but the Court of Appeals reached its holding after a fact-sensitive analysis after discovery. Through this factual analysis, the Court determined that the behavior in question did not rise to the level necessary to support an award of punitive damages because it was commonplace during the relevant time period and until changes were made in the Social Services Law and the Public Health Law in the early-mid 1980s (id. at 485, 490 ["While it may be difficult for us in the twenty-first century to envisage not discussing mental or physical illness with prospective parents, and while such normative conduct may be deemed tortious even for that time, we cannot say that the record shows that the Agency's motivation was malicious or vindictive.").